## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYTHEON COMPANY a/b/t/<br>NETWORK CENTRIC SYSTEMS,<br>2501 West University Dr.<br>M/S 8064<br>McKinney, TX 75070-0801<br><br>       *Plaintiffs,*<br><br>    v.<br><br>DEPARTMENT OF THE ARMY,<br>USARDECOM Acquisition Center<br>ATTN: AMSRD-ACC-CC<br>4118 Susquehanna Ave<br>APG, MD 21005-3013,<br><br>    and<br><br>WASHINGTON MANAGEMENT<br>GROUP, INC. d/b/a FEDSOURCES<br>1990 M St NW # 400<br>Washington, DC 20036<br><br>       *Defendant.* | Case No. _____ |

### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

COMES NOW Plaintiff Raytheon Company, acting by and through its Network Centric

Systems business unit ("Raytheon"), by and through its undersigned counsel, and move this

Court, pursuant to Federal Rule of Civil Procedure 65, for a Preliminary Injunction to enjoin

Defendant Department of the Army ("Army"), its officers, agents, and employees, and all other

persons in active concert or participation with them, and Defendant Washington Management

Group d/b/a FedSources ("FedSources") from executing or implementing in any way the

Defendant's July 30, 2007 and August 9, 2007 Decisions to release the Plaintiffs' confidential

and proprietary commercial and financial information (including pricing information) related to Contract No. W91CRB-07-D-0029 ("Contract") or further disseminating any information received pursuant to the August 6, 2007 Release to any party.

In support of this Motion, Plaintiff Raytheon respectfully submits the accompanying Memorandum in Support of Motion for Preliminary Injunction.

WHEREFORE, Plaintiff Raytheon request that this Court set a hearing date and enter an order setting a briefing schedule; that this Court grant this Application; that this Court enter an order preliminarily enjoining the Defendants from releasing or further disseminating Plaintiffs' confidential and proprietary commercial and financial information related to the Contract for such a period necessary to allow the Court to resolve this action on the merits of the case; and that this Court grant Plaintiff such other and further relief as justice may require.

Respectfully submitted,

ARNOLD & PORTER, LLP

By: _____
Kristen Ittig, Bar No. 452340
Stuart Turner, Bar No. 478392
555 Twelfth Street
Washington, D.C. 20004
(202) 942-5000 Telephone
(202) 942-5999 Facsimile
*Attorney for Raytheon Company - Network Centric Systems*

Dated: August 14, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RAYTHEON COMPANY a/b/t/<br>NETWORK CENTRIC SYSTEMS,<br>2501 West University Dr.<br>M/S 8064<br>McKinney, TX 75070-0801<br><br>       *Plaintiff,*<br><br>   v.<br><br>DEPARTMENT OF THE ARMY,<br>USARDECOM Acquisition Center<br>ATTN: AMSRD-ACC-CC<br>4118 Susquehanna Ave<br>APG, MD 21005-3013<br><br>   and<br><br>WASHINGTON MANAGEMENT<br>GROUP, INC. d/b/a FEDSOURCES<br>1990 M St NW # 400<br>Washington, DC 20036<br><br>       *Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN**
**SUPPORT OF APPLICATION FOR PRELIMINARY INJUNCTION**

COMES NOW the Plaintiff, Raytheon Company, acting by and through its Raytheon

Network Centric Systems business unit ("Raytheon"), by and through its undersigned counsel,

and hereby submits this Memorandum of Points and Authorities in Support of Application for

Preliminary Injunction ("Supporting Memorandum") in support of its concurrently filed

Application for Preliminary Injunction to prevent Defendants Department of the Army ("Army")

and Washington Management Group d/b/a FedSources ("FedSources") from disclosing or further

disseminating Plaintiff's confidential and proprietary commercial and financial information

(including pricing information) related to Contract No. W91CRB-07-D-0029 ("Contract"). Plaintiff Raytheon will suffer immediate and irreparable injury unless this Court grants the requested injunctive relief to maintain the status quo pending the outcome of this litigation.

### STATEMENT OF FACTS

On or about June 26, 2007, Defendant Army awarded Plaintiff Raytheon Contract No. W91CRB-07-D-0029, for delivery of thermal weapon sights for use by Army warfighters ("the Contract"). The Contract was and remains a multiple-award firm fixed priced "Indefinite Delivery, Indefinite Quantity" ("ID/IQ") contract. The Contract was and remains for a period of five years. At the same time, similar contracts were issued to BAE Systems, Inc. ("BAE") and DRS, Inc. ("DRS"). BAE and DRS are competitors of Raytheon's in the thermal weapon sight market. (See Declaration of Carol A. Harrington, attached hereto as Exhibit 1, ¶ 2-3.)

Very detailed technical specifications and performance requirements for the thermal weapon sights procured by the Contract were established by the Army and provided to all offerors. The resulting thermal weapons sights were, with minor variations, substantially identical in design and technical performance. As such, the competition was primarily conducted on the basis of pricing and delivery options. As the contract proceeds, the Army will issue requests for proposals to fill delivery orders for the specified thermal weapon sights. Competition for these delivery orders will similarly be conducted primarily on the basis of price and delivery options. (Harr. Decl., ¶ 4.)

On or about July 5, 2007, Defendant FedSources submitted to Defendant Army a request pursuant to FOIA ("FedSources FOIA Request"). The FOIA Request asked Defendant Army to produce the Contract, which included all of Raytheon's proprietary pricing data, and the

accompanying Statement of Work ("SOW"), which incorporated proprietary elements of Raytheon's proposal.

Defendant Army notified Plaintiff Raytheon of this request by email dated July 16, 2007 ("July 16, 2007 Email"). (See Exhibit A to Complaint.) The July 16, 2007 Email also stated "If you have any questions regarding the release of these documents, please [respond] by 24 Jul 07." (Id.; Harr. Decl., ¶5.)

On or about July 23, 2007, Plaintiff Raytheon responded to the July 16, 2007 Email by submitting to Defendant Army its Opposition to the FOIA Request ("Opposition to FedSources FOIA Request"). (See Exhibit B to Complaint.) By its Opposition to FedSources FOIA Request, Raytheon strenuously objected to the release of all line-item price and price-related information contained in the Contract, and all proprietary information contained in either the Contract or the SOW. The Opposition to FedSources FOIA Request also stated the legal grounds supporting Raytheon's demonstration that the release of the specified information is not authorized by the Federal Acquisition Regulation ("FAR"), is not authorized by FOIA, and is prohibited by the Trade Secrets Act. Raytheon also provided proposed redacted versions of the Contract and the SOW, indicating specifically what information Raytheon believed to be protected from release. (See Exhibit C to Complaint[1]; Harr. Decl, ¶ 6.)

In mid-July the Army received a second FOIA request, submitted by the Law Offices of Gregory D. Jordan ("Jordan FOIA Request"). The Jordan FOIA Request asked Defendant Army

---

[1] Raytheon has concurrently moved to file Exhibits C and F under seal. Therefore, Exhibits C and F are not attached to the Complaint, but are attached to the concurrently filed Motion to Seal, per LCvR 5.1(j).

to produce the Contract, which included all of Raytheon's proprietary pricing data, and all attachments, which include the Statement of Work ("SOW").

Defendant Army notified Plaintiff Raytheon of this request by email dated July 17, 2007 ("July 17, 2007 Email"). (See Exhibit D to Complaint.) The July 17, 2007 Email also stated that it was the Air Force's intent to release the requested material, and that Raytheon should respond by August 2, 2007 with any response. (Harr. Decl. ¶ 7.)

On or about August 2, 2007, Plaintiff Raytheon responded to the July 17, 2007 Email by submitting to Defendant Army its Opposition to the Jordan FOIA Request ("Opposition to Jordan FOIA Request"). (See Exhibit E to Complaint.) By its Opposition to Jordan FOIA Request, Raytheon strenuously objected to the release of all line-item price and price-related information contained in the Contract and attachments. The Opposition to Jordan FOIA Request also stated the legal grounds supporting Raytheon's demonstration that the release of the specified information is not authorized by the Federal Acquisition Regulation ("FAR"), is not authorized by FOIA, and is prohibited by the Trade Secrets Act. Raytheon also provided proposed redacted versions of the Contract and the attachments, indicating specifically what information Raytheon believed to be protected from release. (See Exhibit F to Complaint.)[2] The Army sent Raytheon a letter rejecting these arguments, and stating that the Army intended to release the requested documents on August 20, 2007. (See Exhibit G to Complaint; Harris Decl. ¶ 8-9.)

---

[2] Raytheon has concurrently moved to file Exhibits C and F under seal. Therefore, Exhibits C and F are not attached to the Complaint, but are attached to the concurrently filed Motion to Seal, per LCvR 5.1(j).

Upon information and belief, the Army has received at least one other FOIA request, but the Army has taken the position that once the August 20, 2007 release takes place, the Army will have determined the releaseabilty of the entire contract file, and will process all further requests under the determinations made in response to the first two. (Id.)

The Contract includes Raytheon's pricing for delivery of completed thermal weapon sights, including base prices and "range prices," i.e. different prices set for orders of varying quantities of sights, with "volume discounts" applied to prices for larger orders. The contract also included pricing for spare parts and support options. Both the Contract and the attachments included terms and conditions offered by Raytheon as part of its competitive strategy, including warranty terms and delivery schedule commitments. All of this information was redacted from the Contract and attachments Raytheon submitted with its two Oppositions to the FOIA Requests. (Harr. Decl. ¶ 10.)

On August 9, 2007, the Army informed Raytheon via telephone that it had released elements of the Contract to FedSources on August 6, 2007. Subsequent conversation on August 9, 2007 clarified that the Army had released to FedSources, at a minimum, all of Raytheon's base contract pricing, as well as a completely unredacted SOW. At this time, Raytheon has not been provided with a copy of the as-released documents. (Harr. Decl. ¶11.)

Raytheon was not notified prior to the August 9, 2007 telephone call that the Army had overruled its objection, and was afforded no opportunity to appeal the Army's determination to this Court prior to release. The Army stated that on July 30, 2007, the Army had written and sent a letter notifying Raytheon of the decision via Federal Express ("FedEx") overnight mail ("July 30, 2007 Decision"). The Army stated, however, that the package had been returned to the Army

by FedEx on August 9, 2007 as undeliverable, because it had been addressed to Raytheon's P.O. box, and FedEx does not deliver to P.O. boxes. (Harr. Decl. ¶ 12.)

The Army faxed Raytheon a copy of the July 30, 2007 Decision letter on August 9, 2007, along with a copy of the shipping label on the FedEx envelope. (See Exhibit H to Complaint.) The envelope was addressed to Ms. Carol Harrington, Senior Manager, Contracts, Raytheon, P.O. Box 660246, M/S 31, Dallas, TX, 75260. Directly below the line upon which the P.O. box number was entered was the pre-printed instruction "We cannot deliver to P.O. boxes." Raytheon's Objection to FOIA Request included a return address, including a P.O. box number, which would have been effective for mailing by methods other than FedEx. Raytheon never requested correspondence to be sent via FedEx. Page 1 of the Contract included a street address, which would have been sufficient to ensure delivery via FedEx. (Harr. Decl. ¶ 13-14.)

The July 30, 2007 Decision, received by Raytheon on August 9, 2007, stated that the Army had determined that Raytheon "fail[ed] to support a conclusion that competitive harm will result from release of unit pricing, total amount, range pricing, range quantities, and warranty information in statement of work (3.2.10). This information reflects the price the government pays and is not exempt from release. I am directing the release of the basic contract and attachment 1 (Statement of Work). This release will be effected on August 6, 2007." (Exhibit H; Harr. Decl. ¶ 15.)

Upon information and belief, FedSources is a consulting company that, *inter alia*, files FOIA requests on behalf of third party clients. Raytheon counsel has contacted FedSources and discussed the facts set forth above. FedSources has informed Raytheon that it has located the package sent by the Army before it was opened. FedSources counsel has committed to retain the package unopened until this Court makes a determination on the merits. Therefore, the

information has not been released to the public, and the authority of this Court to afford relief on the merits is unaffected by the August 6, 2007 Release.    Upon information and belief, FedSources' client is a direct competitor of Raytheon's in the thermal weapon sight market.

At all relevant times, Plaintiff Raytheon has considered the information sought by the FOIA Requests to be confidential and proprietary commercial and financial information within the meaning of FOIA and trade secrets within the meaning of the TSA, and have protected it as such. (Harr. Decl. ¶ 16-17.)

Under the Contract, and the contracts issued to BAE and DRS, all competitors will have the opportunity to provide revised pricing for future individual delivery orders that is lower than that currently identified in their contract.    Under these circumstances, the redacted information identified per the enclosures to the Objections to FOIA Requests is competition sensitive information and source selection sensitive information, the disclosure of which is likely to cause substantial harm to Raytheon's competitive position for future delivery orders under the Thermal Weapon Sight II Bridge ("TWSIIB") program.    The program, by its very structure, remains competitive with each future delivery order until all five years of IDIQ range options are either exercised or expire.

While it is true that in most cases competition for contracts is based on more than just price, courts reviewing release of pricing data under FOIA have clearly ruled that no other factor is as readily quantifiable or objective as price. This is particularly true in the case of the TWSIIB program.    Under the current contract, there is no meaningful difference in technical approach between the offerors, as all offerors have been contracted to produce essentially the same item, under the same specifications. (Harr. Decl. ¶ 4.)    Therefore, the importance of price will be greatly magnified as a competitive discriminator between the offerors.

## ARGUMENT

**A.    Legal Standards For Preliminary Injunctive Relief.**

In considering a motion for a preliminary injunction, the Court must apply a balance of hardships test. Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C. Cir. 1977); accord Gasser v. District of Columbia, 2004 WL 1248980, June 7, 2004 (D.C. Cir. 2004) (recognizing the stringent standards required under Washington Metro Area Transit). To properly balance the hardships, the Court is required to weigh the relative importance of four factors:

    (1)    the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;

    (2)    the likelihood of irreparable harm to the defendant if the requested relief is granted;

    (3)    the likelihood that the plaintiff will succeed on the merits; and

    (4)    the public interest.

Id. at 843 (citing Virginia Petroleum Jobbers Assoc. v. FPC, 259 F.2d 921 (D.C. Cir. 1958)); accord Change, Inc. v. District of Columbia, 2003 WL 1873942, Apr. 11, 2003 (D.C. Cir. 2003) (citing Virginia Petroleum as standard for deciding injunction). The "balance of hardships" reached by comparing the relevant harms to the plaintiff and defendant is the key determination and dictates how strong a showing of likelihood of success the plaintiff must make. Washington Metro. Area Transit, 559 F.2d at 844. The plaintiff is not required to prove that its ultimate success is a mathematical probability. Washington Metro. Area Transit, 559 F.2d at 843. Rather, "an order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant." Id. at 844.

- 8 -

**B.**    **The Balance Of The Hardships Weighs Heavily In Favor Of Granting Plaintiff's Applications For Preliminary Injunction.**

Application of the four-part balance of hardships test to the facts of this case demonstrates that Plaintiff's Application for a preliminary injunction should be granted.

**1.**    ***Plaintiff Raytheon Will Suffer Irreparable Harm if the Preliminary Injunction is Denied.***

Plaintiff Raytheon will suffer imminent and irreparable injury in the absence of injunctive relief. Defendant Army has notified Plaintiff Raytheon that it has released documents containing the Plaintiff's pricing and other contract data for the basic contract period. (See July 30, 2007 Decision, Exhibit H to Complaint.)[3] The Army has also informed that it intends to release the contract and all of the attachments to at least one, possibly two or more parties on August 20, 2007. (See Exhibit G to Complaint.)

By public disclosure of Raytheon's pricing information, competitors will be able to anticipate Raytheon's prices and revise their future bids on TWSIIB delivery orders accordingly on similar contracts. Once Raytheon's pricing is released to the public, its confidentiality will be permanently and irrevocably destroyed, and Raytheon will suffer substantial competitive harm which cannot be redressed, even if Raytheon ultimately were to prevail on the merits. Therefore, its injury is inherently irreparable. See Honeywell, Inc. v. Consumer Product Safety Commission, 582 F. Supp. 1072, 1078 (D.D.C. 1984); Metropolitan Life Insurance Company v. Usery, 426 F. Supp. 150, 172 (D.D.C. 1976).

---

[3] Fortunately, FedSources' status as a "middleman" has resulted in the unusual situation where the Army's precipitate release of the information has not yet resulted in harm to Raytheon. FedSource pulled the unopened package from its mail room, and FedSources counsel is retaining it unopened in her office until this Court decides this "reverse-FOIA" suit on the merits. Therefore, the information remains confidential for the moment, as it remains within the effective control of the Army and has not been released to the public.

The damage resulting from this disclosure is immediate and severe.  The Plaintiff's competitors will use the information to predict Raytheon's bids for future TWSIIB delivery orders and underbid them for TWSIIB work.  This is precisely the injury that led this Court in Canadian Commercial Corp v. Department of the Air Force, 442 F.Supp.2d 15 (D.D.C. 2006) to follow the guidance of the D.C. Circuit Court of Appeals in McDonnell Douglas Corp v. United States Department of the Air Force, 375 F.3d 1182, 1193 (D.C. Cir. 2004), reh'g en banc denied, No. 02-5342 (D.C. Cir. 2004), and grant relief and block disclosure of the information.  As this Court stated, "Disclosure of plaintiffs' option year prices would likely cause plaintiffs substantial competitive harm by informing the bids of its rivals in the event the contract is rebid."  Canadian Commercial Corporation, 442 F. Supp. 2d. at 35-3.  The danger is particularly immediate in this case, as the contract will by definition be rebid every time the Army issues a solicitation for a TWSIIB delivery order, under which price will be the primary factor determining the Army's award decision for future TWSIIB delivery orders.  Solicitations for such orders have already begun to issue to the offerors from the Army.  (Harr. Decl., ¶ 18.)  For these reasons, Plaintiff Raytheon is likely to suffer immediate and irreparable injury unless Defendants are preliminarily enjoined from releasing or further disseminating the information sought by the FOIA Request.

## 2.    *Defendant Army Will Not Be Harmed if the Preliminary Injunction is Granted.*

Defendant Army will not suffer any injury from the issuance of a preliminary injunction preventing the release of Plaintiff's pricing and contract data.  Raytheon is seeking to prevent disclosure of information that has not previously been made available to the public by the Plaintiff or the Defendant.  There is no pressing public need for the immediate release of this

information and no detriment to be suffered by the Army if it is required to withhold release of the information.

The issuance of a preliminary injunction will do nothing more than maintain the status quo pending a determination of the merits of this case.  Therefore, Defendants will suffer no harm.

### 3.    *The Plaintiff is Likely to Succeed on the Merits of this Case.*

The Complaint filed concurrently with the Application for Preliminary Injunction alleges two violations of the Administrative Procedure Act.  In short, the Plaintiff first alleges that the Defendant is not authorized by FOIA to release the requested information.  The Plaintiff also alleges that the Defendant is prohibited by the Trade Secrets Act, 5 U.S.C. §1905, to release the requested information.  Accordingly, the Plaintiff alleges that Defendant Army's July 30, 2007 Decision and August 6, 2007 Release are in excess of Defendant Army's statutory jurisdiction, authority, or limitations, or short of statutory right, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Plaintiff Raytheon is likely to succeed in its case against Defendant Army.  Indeed, the facts presented in this case are directly in line with both the governing precedent in this Circuit, and the most recent treatment of this issue by this Court.  The risk of undercutting prices on future orders is at the center of the D.C. Circuit's most recent statement on the reach of Exemption 4.  In <u>McDonnell Douglas Corp v. United States Department of the Air Force</u>, the D.C. Circuit blocked release of unit prices where it was apparent from the record that disclosure would lead to underbidding.  <u>McDonnell Douglas</u>, 375 F.3d at 1190 (2004).    This Court recently applied <u>McDonnell Douglas</u> in ruling that option year unit prices should not be released when competitors could use the prices to construct and submit lower priced proposals in an

attempt to "underbid" the awardee and convince the agency to recompete option year work. Canadian Commercial Corp v. Department of the Air Force, 442 F.Supp.2d 15, 35-36, (D.D.C. 2006).

The Army's decision to release Raytheon's proprietary pricing information flies directly in the face of this precedent. In fact, the entirety of the rationale set forth in the Army's July 30, 2007 Decision for ignoring Raytheon's objection is as follows: "This information reflects the price the government pays and is not exempt from release." (July 30, 2007 Decision, Exhibit H to Complaint.)[4] In other words, according to the Army, no pricing data of any kind is exempted under FOIA. However, the governing precedent firmly rejects any such *per se* rule in favor of releasing price information. Canadian Commercial Corporation, 442 F. Supp. 2d. at 39; McDonnell Douglas, 375 F.3d at 1192. The prices protected under Canadian Commercial Corporation and McDonnell Douglas were clearly "price[s] the government paid," but were found by this Court and this Circuit to require protection. As such, it is clear that Raytheon is likely to prevail on the law.

The facts of this case also fit firmly within the circumference of the relevant precedent. In fact, in the case of the TWSIIB contract, the competitive harm is even more immediate and compelling, as the competition for the procured work has not ended, but will continue, delivery order by delivery order, on a basis primarily defined by price. The risk of underbidding is even stronger here than under the facts of McDonnell Douglas or Canadian Commercial Corporation.

---

[4] This is the only stated rationale for the Army's actions, as the August 9, 2007 Decision gave no reason whatsoever for the Army's decision to disregard Raytheon's objections.

In addition to a showing of the likelihood of substantial competitive harm, FOIA requires analysis based on the need of the public to know in order to evaluate government responsibility and to provide ongoing oversight. However, where the total contract quantities and total pricing have already been released (as they have here), the public has little need for further detailed information on competitor pricing. McDonnell Douglas, 375 F.3d at 1193 (2004) Such detailed information

> has little to do with the core purpose of the FOIA, namely, contributing significantly to public understanding of the operations or activities of the government. On the contrary, the information now in suit reveals the internal workings of the contractor, not those of the Government, and would seem to shed little if any light upon the agency's performance of its statutory duties.

Id. In its essence, FOIA is a disclosure statute, but FOIA recognizes that while citizens must be able to determine what their government is up to, they must also be able to confide in their government. FOIA, in particular Exemption 4, represents a carefully balanced compromise between the interests of the public in disclosure and the legitimate privacy interests of those who do business with the government. The information at issue in this case sheds no useful light upon the practices of government, but instead aims a spotlight directly onto the competitive strategies of Raytheon.

The facts of this case place it squarely within the ambit of Canadian Commercial Corporation and McDonnell Douglas. As demonstrated below, Raytheon is likely to succeed in its showing that its prices and price-related information included in the documents sought by the FOIA Request are exempted from the disclosure authorizations of FOIA and are prohibited from release by the Trade Secrets Act.

a.   **The Freedom of Information Act Exempts Plaintiff's Proprietary Information from Release.**

The information requested by FedSources and Jordan on behalf of their clients contains confidential business information that is exempt from disclosure pursuant to FOIA. The FOIA statute authorizes agencies to disclose certain information upon a request for records. 5 U.S.C. § 552(a) (2000). However, FOIA by its own terms does not apply to "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). This provision of FOIA is known as Exemption 4. McDonnell Douglas Corp. v. Dept. of the Air Force, 215 F. Supp. 2d 200, 204 (D.D.C. 2002). In this instance, the disclosure requirements of FOIA do not apply to Raytheon's information because it is "commercial or financial information" that is "privileged or confidential."

(1)   *The Information Sought Includes "Commercial or Financial Information" for FOIA Purposes.*

The requested information includes line-item pricing information that is "commercial or financial information" under Exemption 4. To fall within the scope of Exemption 4, the "information itself must in some fashion be commercial or financial in nature or use." New York Public Interest Research Group v. EPA, 249 F. Supp. 2d 327, 333 (S.D.N.Y. 2003). Indeed, "line-item pricing information ... is exactly the type of information that constitutes 'confidential commercial or financial information' for purposes of FOIA." MCI Worldcom, Inc. v. Gen. Servs. Admin., 163 F. Supp. 2d 28, 35 (citing McDonnell Douglas Corp. v. NASA, 180 F.3d 303, 306 (D.C. Cir. 1999)).

It is self-evident that Plaintiff's line-item unit pricing information is commercial in nature and use. This type of information has been used by the Army throughout all stages of this procurement, including source selection and contract performance. In fact, the award of the

- 14 -

Contract included award of an initial TWSIIB delivery order based upon the prices the Army released to FedSources.    Clearly, this pricing information is, by its very nature and use, "commercial or financial."

> (2)    *The Information Sought Includes Information that is "Privileged or Confidential."*

The requested information is also "privileged or confidential" under FOIA.    Under FOIA case law, whether such information is confidential, and therefore protected from disclosure, turns on whether it was provided to the government voluntarily or under compulsion.    <u>McDonnell Douglas v. NASA</u>, 180 F.3d at 304.    Under either analysis, the pricing information that is sought in this case is unquestionably "privileged or confidential."

> (a)    The Plaintiff's Information is "Privileged or Confidential" if it was Provided Voluntarily.

The circumstances show that the Plaintiff provided the Army with their pricing information voluntarily.    The Plaintiff's decision to bid on the Army's thermal weapon sight contract was entirely voluntary.    Raytheon, like any other prospective offeror, was under no compulsion to bid on the procurement.    Raytheon expressly and conspicuously demonstrated its subjective intent to voluntarily submit its information to the Army.    The cover of Raytheon's final proposal clearly stated that the submitted material was proprietary and confidential.

If Raytheon believed that the Army was forcing it to provide its pricing information, it logically would not have conditioned its submission.    On the contrary, Raytheon submitted its proprietary information in a manner that indicated that its information was being provided voluntarily and under the express condition that the Army keep its information in confidence. The Army did not object to this express condition when Raytheon submitted its proposal.

Clearly, the submission of Raytheon's pricing information to the Army was both objectively and subjectively voluntary.

The D.C. Circuit Court of Appeals has recognized that "financial or commercial information provided to the Government on a voluntary basis is 'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871., 880 (D.C. Cir. 1992) (en banc). There is a "private interest in preserving the confidentiality of information that is provided the Government on a voluntary basis." Id. at 879.

Plaintiff Raytheon never releases this type of pricing information to the public. As stated above, Raytheon clearly notified the Army that it considered its submitted information to be proprietary and confidential. Accordingly, Raytheon's pricing information is "privileged or confidential" for the purposes of Exemption 4.

(b)   The Plaintiff's Information is "Privileged or Confidential" Even if it was Provided Involuntarily.

Assuming *arguendo* that the Army somehow compelled Plaintiff to participate in the procurement and submit its commercially sensitive information, that information is still exempt from the FOIA disclosure requirements.  If the Government compels a contractor to submit information, "it will be considered confidential only if disclosure would be likely either (1) to impair the government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." McDonnell Douglas v. NASA, 180 F.3d at 305 (citing Nat'l Parks and Conservation Assoc. v. Morton, 498 F.2d 765, 770 (D.C. Cir. 1974)) (emphasis supplied).  In this case, disclosure of Plaintiff's pricing information would satisfy both of these conditions.

(i)   Disclosure or Further Dissemination of the Information Would Thwart the Procurement Process and Contravene Government Objectives.

Though "[t]he government agency from which disclosure is sought is in the best position to determine whether an action will impair its information gathering in the future," Raytheon respectfully asserts that the release of the requested information would seriously impair the Government's ability to obtain necessary information by obstructing similar future procurements and by undermining the Government's primary procurement policy objectives.  See McDonnell Douglas v. Air Force, 215 F. Supp. 2d at 206.

Disclosure of the Plaintiff's commercially sensitive information would impair the Army's ability to obtain necessary information in the future because it would discourage highly competitive contractors from bidding on government solicitations of the type at issue here.  In the instant procurement, the government's explicit intention was to utilize ID/IQ delivery order

- 17 -

contracting to create an arrangement where price was the primary ground of competition for future task orders, and all subjective or technical criteria were stripped from the projected competition. Under such circumstances, should the Army be entitled to release all pricing data, contractors would understand that immediately upon award of the contract, they would be forced into a descending spiral of price reductions that would quickly render their pre-award pricing calculations obsolete. Under such circumstances, it is impossible for a contractor to meaningfully evaluate whether or not a contract is worth pursuing. The result would either be (a) generally higher pricing of offers, as contractors built risk margin into their proposed prices, or an increasing number of aggressively priced contracts that slide quickly into the red. Either of these outcomes will negatively impact the Army's procurement objectives - in the former case preventing the Army from receiving bids accurately priced to the solicited work, and in the latter, a decreased willingness of contractors to embark upon such an unstable and unprofitable enterprise at all.

"Unless persons having necessary information can be assured that it will remain confidential, they may decline to cooperate with officials and the ability of the Government to make intelligent, well informed decisions will be impaired." National Parks, 498 F.2d at 767. "It is a matter of common sense that the disclosure of information the Government has secured from voluntary sources on a confidential basis will ... jeopardize its continuing ability to secure such data on a cooperative basis." Critical Mass, 975 F.2d at 880.

Contractors would understandably be reluctant to submit highly confidential and proprietary information in the future, including their pricing data, if the Army insists upon its policy of *per se* universal disclosure. As a result, the Army could very well be left with mediocre, or even substandard, contractors as the only bidders on a solicitation. This obviously

- 18 -

would impair the quality of the goods and services the government receives, and would potentially inflate the price for those goods and services. Furthermore, high-technology military procurements, such as the one in this case, can only be performed by a few responsible contractors. A policy of disclosure would surely jeopardize the willingness of these sophisticated companies to contract with the Army, thus stifling the Army's ongoing effort to purchase the highest quality and most advanced hardware and services.

If the Army releases the requested information, Raytheon would certainly be reluctant to participate in future procurements of this type for the reasons described. This, of course, would injure the Army in the future because, as demonstrated by its success in this procurement, Raytheon is clearly a competitive contractor with much to offer. The damage to the Army would be further compounded because there are very few high-technology service providers that can compete at the level necessary to fulfill the Army's objectives. That is why only three offerors received ID/IQ contracts in response to this solicitation.[5] The lack of other qualified bidders already significantly warps the competitive landscape of these types of procurements.

In addition to the deterrent effect of disclosure, releasing this type of commercial and financial information contravenes the Government's pronounced policy of "an open, unbiased and impartial competition [that] applies to each and every stage of the procurement process." R & W Flammann GmbH v. United States, 53 Fed. Cl. 647, 654 (2002).

Therefore, Plaintiff respectfully suggests that it is not in the interests of the Army to release Plaintiff's confidential pricing information. First, it would deter Raytheon and its

---

[5] Presumably, one of these two companies - BAE and DRS - is FedSources' or Jordan's unnamed client and the true requester in this "reverse FOIA" case.

competitors from submitting bids on important and necessary future procurements.  Second,

disclosure of the requested materials contravenes the fundamental precepts of U.S. procurement

policy by destroying the fair and open competition.

> (ii)    Disclosure of the Pricing Information Would
> Cause  Substantial  Harm  to  Plaintiff's
> Competitive Position.

It is beyond dispute that disclosure of the requested pricing information would cause

substantial harm to the competitive positions of Raytheon.[6]  "Exposure of a contractor's prices is

---

[6] Two recent cases confirm the solicitude shown by the courts for competitively sensitive information, when deciding to withhold information demanded under the Freedom of Information Act (FOIA).

In Wickwire Gavin v. United States Postal Service, 2004 WL 178647 (4th Cir. 2004), the court of appeals upheld the Postal Service's refusal to disclose spreadsheets containing item retail prices under a mail supplies contract with Hallmark Cards. The USPS defended this FOIA action by arguing that the information sought fell within Exemptions 3 and 4 of FOIA.  Prior to appeal, the district court (Eastern District of Virginia) agreed and ruled that the information fell within both Exemptions. In holding that the information fell within Exemption 4, the district court reasoned that the contested data was privileged and confidential because disclosure would "hamper USPS's ability to obtain similar information from other private companies and would likely also harm Hallmark's competitive position." Wickwire Gavin, at *3 (citing district court opinion). The court of appeals agreed that the information fell within Exception 3, and so left undisturbed the district court's finding on Exception 4.

In Lion Raisin v. United States Dept. of Agric., 2004 WL 63620 (9th Cir. 2004), the court of appeals upheld the district court's application of Exemption 4 to documents created by USDA inspectors. The documents contained the quality and volume of Lion's competitors' inspected raisins. In so holding, the court of appeals reasoned that the release of those documents ("Line Item Check Sheets") would cause substantial competitive harm to Lion's competitors. In particular, the Line Item Check Sheets would reveal "sampling time" information that would allow Lion to infer the volume of its competitors' raisin sales, deduce the number of hours worked, and with that knowledge, cut its prices in order to underbid them. The court of appeals also noted that the raisin business was highly competitive (price differentials between competitors were a fraction of a cent per pound), and therefore small pieces of information could harm a competitor greatly.

Both of these cases demonstrate that the legal standard for withholding information is not "actual competitive harm," but rather only a "likelihood of substantial competitive injury." Lion Raisins, at 6; see also Wickwire Gavin, at 3 (citing district court opinion).  Indeed, competitive harm Raytheon would suffer is more than a likelihood; considering the isolated primacy of price

[Footnote is continued on next page]

generally recognized as resulting in a competitive disadvantage in subsequent procurements." See, e.g., Fisher-Cal Industries, Inc., Comp. Gen. Dec. B-285150.2, 2000 CPD ¶ 115; accord Alatech Healthcare LLC, Comp. Gen. Dec. B-289134.3, 2002 CPD ¶ 73.

In this case, the Plaintiff seeks to protect its basic line item pricing for delivery of thermal weapon sights, as well as its "range pricing" volume discounts and its competitively sensitive contract terms, e.g. warranty duration and coverage. In every instance, disclosure of this information would undeniably cause substantial harm to the Plaintiff because release of the information would provide competitors with detailed proprietary information that would undermine present and future procurements, and permit Raytheon's competitors to underbid Raytheon on all subsequent delivery orders.[7]  It should be noted that offerors on the competitive task orders are encouraged to compete on price. For example, the Air Force recently sent out a solicitation for 29 thermal weapon sights, and requested Raytheon to bid for the work. (See Harrington Declaration, ¶ 18.) The solicitation stated: "Revised pricing can also be submitted, but only if the prices are lower than what was awarded in the basic contract." (See Exhibit I to Complaint.)  In other words, the Air Force is actively encouraging price competition, while publically distributing information that is almost guaranteed to start a downward pricing war that can only help the Air Force, and cannot avoid harming Raytheon.

---

[Footnote continued from previous page]

in all future TWSIIB delivery order competitions, *competitive harm is a virtual certainty* if Plaintiff's line-item pricing is released.

[7] It should be noted that this detrimental effect will increase with each and every delivery order. If the Army may disclose the initial contract prices, it presumably may release the prices contained in future delivery order proposals.  The effects described above will thus be compounded by each subsequent round of distorted pricing.

Disclosing Raytheon's pricing would essentially allow competitors to preview Raytheon's prices for future delivery order procurements. Competitors will have the actual pricing data that the Plaintiff will likely submit in response to any subsequent delivery order from the Army. This would give competitors an enormous competitive edge because they would use this proprietary information to undercut Raytheon's prices. This type of misuse of information is exactly what Exemption 4 is designed to protect against. Nadler v. FDIC, 899 F. Supp. 158 (S.D.N.Y. 1995), aff'd 92 F.3d 93 (2d Cir. 1996).

Raytheon's pricing information could be used to disrupt confidence and performance under the current Contract. If released, the information could be improperly manipulated by the Plaintiff's competitors to argue - incorrectly -- that the Army is not receiving value for the services performed under the Contract. This, in turn, would disrupt the amicable relationship between the Army and the Plaintiff and would interfere with what would otherwise be unproblematic performance under the current Contract. For instance, the requesting competitor could use Raytheon's pricing data to create and submit an unsolicited proposal with lower prices for an already-awarded task order in an attempt to persuade the Government not to exercise any options that may be included in the delivery orders.

In this case, because awarded CLIN quantities have been released and are available in the public domain, Raytheon is particularly sensitive to release of CLIN pricing, range pricing, range quantities and any references to funding or obligated amount by CLIN/SLIN. With little effort, combining the CLIN quantity and pricing information with other publicly available information, a competitor would be able to calculate with reasonable accuracy Raytheon's future competitive bids for future TWSIIB delivery orders.

Finally, the Army's own FOIA regulations direct the application of Exemption 4 to "protect information provided by a nongovernment submitter when public disclosure will probably cause substantial harm to its competitive position." 32 C.F.R. § 806.31(d). Examples of such information included in the regulations are "commercial or financial information received in confidence with ... bids, contracts, or proposals, as well as other information received in confidence or privileged, such as . . . other proprietary data." 32 C.F.R. § 806(d)(1). As previously discussed, the requested information is "commercial or financial" and "received in confidence." Accordingly, Army regulations direct the Army to protect the Plaintiff's pricing information in this case.

As the foregoing analysis indicates, the Plaintiff's pricing information, whether submitted voluntarily or involuntarily, is "commercial and financial information" that is "privileged or confidential." *"If commercial or financial information is likely to cause substantial competitive harm to the person who supplied it, that is the end of the matter."* MCI Worldcom,163 F. Supp. 2d at 35 (emphasis added) (citing McDonnell Douglas v. NASA, 180 F.3d at 306). Release of these prices simply cannot do anything else *but* cause Raytheon significant competitive harm. Accordingly, Exemption 4 covers the Plaintiff's pricing information which is therefore excepted from the disclosure authorization of FOIA.

### b. The Trade Secrets Act Prohibits the Release of Raytheon's Exempted Pricing Information.

Federal law further prohibits the Army from releasing the Plaintiff's confidential and commercially sensitive information. The Trade Secrets Act provides that any government officer or employee who publishes, discloses, or makes known in any manner, or to any extent not authorized by law, any information received in the course of employment that relates to trade

secrets, confidential statistical data, or amounts of any income, profits, or losses, shall be fined or imprisoned for up to a year, or both, and shall also be removed from office or employment. 18 U.S.C. § 1905.

When pricing information falls within Exemption 4 of FOIA, the Government is precluded from releasing it under the Trade Secrets Act. McDonnell Douglas, 180 F.3d at 305 (citing McDonnell Douglas Corp. v. Widnall, 57 F.3d 1162, 1164 (D.C. Cir. 1995)). "Exemption 4 marks the outer boundaries of the government's FOIA privilege by identifying materials that a person making a FOIA request has no right to force the government to divulge, whereas the Trade Secrets Act establishes a private right against unauthorized governmental publications of confidential information." McDonnell Douglas, 57 F.3d at 1164. Thus, when requested information falls within Exemption 4, "the government is precluded from releasing the information by virtue of the Trade Secrets Act." Id.

### 4.   *The Public Interest Will be Served by Issuance of Preliminary Injunctive Relief.*

The Freedom of Information Act and the Trade Secrets Act provisions discussed above reflect a careful balance between the public's general interest in disclosure of information submitted to federal agencies, and its equally important interest in facilitating government operations (including public contracts) by insuring that confidential commercial information of parties that deal with the government will be protected from improper disclosure. As discussed above, disclosure of contractor trade secrets and confidential commercial data may "impair the Government's ability to obtain necessary information in the future." National Parks, 498 F.2d at 770. The Trade Secrets Act embodies this strong public policy by making it a criminal offense for a government employee or agency to disclose a party's trade secrets and similar data.

Furthermore, FAR 24.203(b) sets forth the policy to be implemented concerning contract information arguably exempt from disclosure under the Freedom of Information Act. It states:

> Contracting officers may receive requests for records that may be exempted from mandatory public disclosure. The exemptions most often applicable are those relating to ... trade secrets and confidential commercial or financial information, .... Since these requests often involve complex issues requiring an in-depth knowledge of a large and increasing body of court rulings and policy guidance, contracting offers are *cautioned to comply with the implementing regulations of their agency* and obtain necessary guidance from the agency officials having Freedom of Information Act responsibility.

(Emphasis added.)

As FAR 24.203(b) acknowledges, the determination of any particular FOIA public disclosure issue involving contract information is often a complex task. More than one public interest is at stake. Therefore, the paramount public interest to be served in such cases is in a carefully reasoned decision, through which the various factors can be fully raised and rationally considered. This interest is not served by allowing the Army improperly apply federal statutes. It will, however, be served by maintaining the status quo until the merits of this dispute can be heard and decided. See <u>Honeywell</u>, 582 F. Supp. at 1078-79.

## CONCLUSION

Because the balance of hardships tips heavily in the Plaintiff's favor as a result of the irreparable harm it will suffer if Defendant Army releases to a competitor the Plaintiff's pricing information, and because the Plaintiff have made a strong showing that they are likely to prevail on the merits of the case, this Court should prohibit the Army from disclosing the information sought by any FOIA Request by issuing a preliminary injunction until this matter can be resolved on the merits.

Respectfully submitted,

ARNOLD & PORTER, LLP

By: _____
Kristen Ittig, Bar No. 452340
Stuart Turner Bar No. 478392
555 Twelfth Street
Washington, D.C. 20004
(202) 942-5000 Telephone
(202) 942-5999 Facsimile
*Attorney for Raytheon Company - Network
Centric Systems*

Dated: August 14, 2007

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RAYTHEON COMPANY a/b/t<br>NETWORK CENTRIC SYSTEMS,<br>2501 West University Dr.<br>M/S 8064<br>McKinney, TX 75070-0801<br><br>*Plaintiffs,*<br><br>v.<br><br>DEPARTMENT OF THE ARMY,<br>USARDECOM Acquisition Center<br>ATTN: AMSRD-ACC-CC<br>4118 Susquehanna Ave<br>APG, MD 21005-3013<br><br>and<br><br>WASHINGTON MANAGEMENT<br>GROUP, INC. d/b/a FEDSOURCES<br>1990 M St NW # 400<br>Washington, DC 20036<br><br>*Defendant.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     C.A. No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF CAROL A. HARRINGTON

1.      I am a Senior Manager of Contracts for Raytheon Company's Network

Centric Systems business unit.  By virtue of this position I am familiar with the Thermal

Weapon Sight II Bridge program, the competition for the effort, and Raytheon's contract

under that program.

2.      On or about June 26, 2007, Defendant Army awarded Plaintiff Raytheon

Contract No. W91CRB-07-D-0029, for delivery of thermal weapon sights for use by

Army warfighters ("the Contract").  The Contract was and remains a multiple-award firm

fixed priced Indefinite Delivery, Indefinite Quantity ("ID/IQ") contract.  The Contract was and remains for a period of five years.

3.    At the same time, similar contracts were issued to BAE Systems, Inc. ("BAE") and DRS, Inc. ("DRS")  BAE and DRS are competitors of Raytheon's in the thermal weapons sight market.

4.    Very detailed technical specifications and performance requirements for the thermal weapon sights procured by the Contract were established by the Army and provided to all offerors.  The resulting thermal weapons sights were, with minor variations, substantially similar in design and technical performance.  As such, the competition was primarily conducted on the basis of pricing and delivery options.  As the contract proceeds, the Army will issue requests for proposals to fill delivery orders for the specified thermal weapon sights.  Competition for these delivery orders will similarly be conducted primarily on the basis of price and delivery options.

5.    On July 16, 2007, the Army informed Raytheon via email that FedSources had submitted to the Army a request pursuant to the FOIA.  The FOIA Request asked the Army to produce the Contract, which included Raytheon's proprietary pricing data, and the accompanying Statement of Work ("SOW"), which incorporated a proprietary element of Raytheon's proposal, the terms of Raytheon's offered warranty.

6.    On or about July 23, 2007, Plaintiff Raytheon responded to the July 16, 2007 email by submitting to Army its Opposition to the FedSources FOIA Request.  In its Opposition to FedSources FOIA Request, Raytheon strenuously objected to the release of all line-item prices and price-related information including Raytheon's proposed range

- 2 -

bins identifying quantity price-point breaks contained in the Contract, and all proprietary information contained in either the Contract or the SOW. The Opposition to FedSources FOIA Request also stated the legal grounds supporting Raytheon's demonstration that the release of the specified information is not authorized by the Federal Acquisition Regulation ("FAR"), is not authorized by the FOIA, and is prohibited by the Trade Secrets Act. Raytheon also provided proposed redacted versions of the Contract and the SOW, indicating specifically what information Raytheon believed to be protected from release.

7.    On July 17, the Army notified Raytheon of a second FOIA request, submitted by the Law Offices of Gregory D. Jordan. The Jordan FOIA Request asked Defendant Army to produce the Contract, which included all of Raytheon's proprietary pricing data, and all attachments, which include the Statement of Work ("SOW"). The July 17, 2007 email also stated that it was the Army's intent to release the requested material, and that Raytheon should respond by August 2, 2007 with any response.

8.    On or about August 2, 2007, Plaintiff Raytheon responded to the July 17, 2007 email by submitting to the Army its Opposition to the Jordan FOIA Request. By its Opposition to Jordan FOIA Request, Raytheon strenuously objected to the release of all line-item price,price-related information and proprietary information contained in the Contract and attachments. The Opposition to Jordan FOIA Request also stated the legal grounds supporting Raytheon's demonstration that the release of the specified information is not authorized by the Federal Acquisition Regulation ("FAR"), is not authorized by the FOIA, and is prohibited by the Trade Secrets Act. Raytheon also

provided proposed redacted versions of the Contract and the attachments, indicating specifically what information Raytheon believed to be protected from release.

9.      On or about August 9, 2007, the Army sent Raytheon a letter rejecting the arguments regarding the Jordan Request and stating that the Army intended to release the requested documents to Jordan on August 20, 2007. In a telephone conversation with the Army representative, I was told that the Army has received at least one other FOIA request, but that once the August 20, 2007 release takes place, the Army will have determined the releaseabilty of the entire contract file, and will process all further requests at that time under the determinations made in response to the first two with no further notice to Raytheon.

10.     The Contract includes Raytheon's pricing for delivery of completed thermal weapon sights, including base prices and "range prices," i.e. different prices set for orders of varying quantities of sights, with "volume discounts" applied to prices for larger orders. The contract also included pricing for spare parts and support options. Both the Contract and the attachments included terms and conditions offered by Raytheon as part of its competitive strategy, including warranty terms and delivery schedule commitments. All of this information was redacted from the Contract and attachments Raytheon submitted with its two Oppositions to the FOIA Requests.

11.     On August 9, 2007, the Army informed Raytheon via telephone that it had released elements of the Contract to FedSources in response to the FedSources Request on August 6, 2007. Subsequent conversation on August 9, 2007 clarified that the Army had released to FedSources, at a minimum, all of Raytheon's base contract pricing, as

well as a completely unredacted SOW. At this time, Raytheon has not been provided with a copy of the as-released documents.

12. Raytheon was not notified prior to the August 9, 2007 telephone call that the Army had overruled its objection, and was afforded no opportunity to appeal the Army's determination to this Court prior to release. The Army stated that on July 30, 2007, the Army had written and sent a letter notifying Raytheon of the decision via Federal Express ("FedEx") overnight mail. The Army stated, however, that the package had been returned to the Army by FedEx on August 9, 2007 as undeliverable, because it had been addressed to Raytheon's P.O. box, and FedEx does not deliver to P.O. boxes.

13. The Army faxed Raytheon a copy of the letter on August 9, 2007, along with a copy of the shipping label on the FedEx envelope. The envelope was addressed to myself at "Raytheon, P.O. Box 660246, M/S 31, Dallas, TX, 75260." Directly below the line upon which the P.O. box number was entered was the pre-printed instruction "We cannot deliver to P.O. boxes."

14. Raytheon's Objection to FOIA Request included a return address, including a P.O. box number, which would have been effective for mailing by methods other than FedEx. Raytheon never requested correspondence to be sent via FedEx. Page 1 of the Contract included a street address, which would have been sufficient to ensure delivery via FedEx.

15. The July 30, 2007 Letter, received by Raytheon on August 9, 2007, stated that the Army had determined that Raytheon "fail[ed] to support a conclusion that competitive harm will result from release of unit pricing, total amount, range pricing,

- 5 -

range quantities, and warranty information in statement of work (3.2.10). This information reflects the price the government pays and is not exempt from release. I am directing the release of the basic contract and attachment 1 (Statement of Work). This release will be effected on August 6, 2007."

16.    Raytheon never releases this type of pricing data to any party outside the company or the government in the context of a source selection without confidentiality restrictions. At all relevant times, Raytheon has considered the information sought by the FOIA Request to be confidential and proprietary commercial and financial information within the meaning of the FOIA, and have protected it as such.

17.    At all relevant times, Raytheon has considered the information sought by the FOIA Request to be trade secrets within the meaning of the TSA, and has protected them as such.

18.    On or about August 1, 2007, the Army requested terms from the offerors for a Contract requirement for 29 thermal weapon sights via email.

19.    I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed on August 14, 2007

Carol A. Harrington

- 6 -

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RAYTHEON COMPANY a/b/t <br> NETWORK CENTRIC SYSTEMS, <br> 2501 West University Dr. <br> M/S 8064 <br> McKinney, TX 75070-0801 <br><br>          *Plaintiffs,* <br><br>     v. <br><br> DEPARTMENT OF THE ARMY, <br> USARDECOM Acquisition Center <br> ATTN: AMSRD-ACC-CC <br> 4118 Susquehanna Ave <br> APG, MD 21005-3013 <br><br>     and <br><br> WASHINGTON MANAGEMENT <br> GROUP, INC. d/b/a FEDSOURCES <br> 1990 M St NW # 400 <br> Washington, DC 20036 <br><br>          *Defendant.* | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. _____ |

## [PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR
## PRELIMINARY INJUNCTION

Plaintiff Raytheon Company, acting by and through its Network Centric Systems

business unit ("Raytheon"), has moved for entry of a preliminary injunction enjoining

Defendants Department of the Army and Washington Management Group d/b/a

FedSources from releasing or further disseminating any information in response to any

request under the Freedom of Information Act relating to Raytheon's Contract

No. W91CRB-07-D-0029 with the Army. It is hereby

1930037_1.DOC

ORDERED, ADJUDGED AND DECREED:

1.    Plaintiff's Motion is GRANTED as described in paragraph 2 and 3 herein.

2.    Defendant Department of the Army shall not take any action to release, distribute, or otherwise disseminate any information in response to any request under the Freedom of Information Act relating to Raytheon's Contract No. Contract No. W91CRB-07-D-0029 with the Army.

3.    Defendant Washington Management Group d/b/a FedSources shall not open the package it received from the Department of the Army in response to its Request under the Freedom of Information Act relating to Raytheon's Contract No. W91CRB-07-D-0029 with the Army, and shall not review, release, distribute, or otherwise disseminate any information contained therein.

DONE and ORDERED in Chambers, in Washington, D.C., this ___ day of ____, 2007.


Dated: _____          _____
                                          U.S. District Court Judge

## CERTIFICATE OF SERVICE

  I hereby certify that on August 14, 2007, a true and accurate copy of the foregoing Motion for Preliminary Injunction and Supporting Memorandum, with accompanying exhibit, was served on the following individuals. The Army has never identified a contact in its legal department for this FOIA matter, but Raytheon requests that the Army personnel in receipt of these documents forward the material to the Army's counsel at once:

Beverly McMillan        (Email and Overnight Mail)
Management Analyst
USARDECOM Acquisition Center
ATTN: AMSRD-ACC-CC
4118 Susquehanna Ave
Aberdeen Proving Ground, MD 21005-3013
Tel: (410) 278-0850 (DSN 298)
Email: beverly.mcmillan@us.army.mil

Kathryn J. Bankerd        (Fax and Overnight Mail)
Contracting Officer
USARDECOM Acquisition Center
ATTN: AMSRD-ACC-CC
4118 Susquehanna Ave
Aberdeen Proving Ground, MD 21005-3013
Tel: (410) 278-0850 (DSN 298)
Fax: (410) 306-3740

Carolyn Alston         (Email and Overnight Mail)
General Counsel
Washington Management Group
1990 M St NW # 400
Washington, DC 20036
Tel: (202) 833-1120
Email: calston@washmg.com

Stuart Turner